IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **SHADI TAREK ABUMOALA, AND THE CONJUGAL PARTNERSHIP CONSTITUTED BY SHADI TAREK ABUMOALA AND RANNA AHMAD MUSTAFA; CAROLINE EVELIS SEVERINO RIVAS; POLICARPIO SEVERINO CARABALLO, AND THE CONJUGAL PARTNERSHIP CONSTITUTED BY DELSY MARIA RIVAS AMEZQUITA DE SEVERINO AND POLICARPIO SEVERINO;** | CIVIL NO. 17-1061<br><br>JURY TRIAL DEMANDED |
| Plaintiff, | |
| v. | |
| **AMERICA CRUISE FERRIES, INC.; BAJA FERRIES S.A. de C.V.; STEAMSHIP MUTUAL UNDERWRITING ASSOCIATION LIMITED;** | |
| Defendants. | |

**COMPLAINT**

**TO THE HONORABLE COURT:**

NOW COMES the Plaintiff, **Shadi Tarek Abumoala, and the Conjugal Partnership Constituted by Shadi Tarek and Ranna Ahmad Mustafa; Caroline Evelis Severino Rivas; Policarpio Severino Caraballo, and the Conjugal Partnership constituted by Delsy Maria Rivas Amezquita de**

1

**Severino and Policarpio Severino;** through the undersigned attorneys and respectfully alleges and prays as follows:

## I. INTRODUCTION

1.     This is a federal question action filed by plaintiffs to redress his injuries suffered due to the intentional and/or negligent acts committed by defendants, related to a chain of negligent acts occurred between August 16 and August 17, 2016.

## II.     JURISDICTION AND VENUE

2.     This Court has Admiralty and Maritime Jurisdiction and the claim in within the meaning of Fed. R. Civ. P.9 (h). Admiralty and Maritime Jurisdiction is based upon 28 U.S.C. §1331 and 28 USC §1333.

3.     Moreover, the jurisdiction in this case is also founded pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship between co-Plaintiffs, **Shadi Tarek Abumoala and the Conjugal Partnership Constituted by Ranna Ahmad Mustafa and Shadi Tarek; Caroline Evelis Severino Rivas and Policarpio Severino Caraballo, and  the Conjugal Partnership constituted by  Delsy Maria Rivas Amezquita de Severino and Policarpio Severino;** and Defendant, a corporation registered and with place of business in Puerto Rico. Furthermore, the amount in controversy in the Complaint exclusive of interests and costs exceeds seventy five thousand dollars ($75,000.00).

4.     Venue of this action in this district is proper pursuant to 28 U.S.C. Sec. 1391 (b), since the incident occurred on the navigable waters of the United States in connection with traditional maritime activity such as ferrying

2

passengers from the Dominican Republic to Puerto Rico aboard the M/V Caribbean Fantasy and/or since defendant consented to be sued in PR Federal Court pursuant to Admiralty and Maritime law.

### III.   REQUEST FOR JURY TRIAL

5.   Plaintiffs requests trial by jury.

### IV.   PARTIES

6.   Plaintiffs **Shadi Tarek Abumoala, and the Conjugal Partnership Constituted by Ranna Ahmad Mustafa and Shadi Tarek,** of legal age, with the following address: Barrio Vista del Valle, Apt. B-4 (frente a la Policlínica), San Francisco de Macoris, Dominican Republic.

7.   Plaintiffs**, Caroline Evelis Severino Rivas, Policarpio Severino Caraballo, and  the Conjugal Partnership constituted by  Delsy Maria Rivas Amezquita de Severino and Policarpio Severino,** of legal age, married, with the following address: Calle Doncella de Jerusalén #21, Paraíso de Dios Haina, San Cristobal, Dominican Republic

8.   Defendant **AMERICA CRUISE FERRIES**, **INC.** (herein "ACF") is a corporation duly registered and authorized by the state of Puerto Rico with principal offices in Concordia 249, Mayaguez, PR 00680. Their Resident Agent is: Néstor González García, located at Concordia 249, Mayaguez, PR 00680.

9.   Defendant **BAJA FERRIES S.A. de C.V.** (herein "BAJA FERRIES") is a corporation duly registered and authorized in Mexico, with the physical address in: 2601 S Bayshore Dr. #1110, Miami, FL 33133 and Allende 1025 Esquina Marielo Rubio, Col. Centro, La Paz, B.C.S., Mexico.

3

10.     Codefendant **STEAMSHIP MUTUAL UNDERWRITING ASSOCIATION LIMITED**, [hereinafter "P&I"] was and still is a liability insurer incorporated in the United Kingdom, who had issued and maintained in full force and effect, at the time of the injury and damages as alleged throughout this Complaint, a policy of liability insurance issued to Baja Ferries and/or ACF and/or to the vessel **Caribbean Fantasy**, covering all risks for injuries and accidents that would occur on and within said vessels, and specifically, which would cover liabilities and personal injuries occasioned to crewmembers working aboard the vessel **Caribbean Fantasy.** Said codefendant's address is as follows "Aquatical House, 39 Bell Lane, London, E1 7LU, UK".

### V.     STATEMENT OF CLAIM

### a. Information regarding M/V Caribbean Fantasy (herein "The Ferry")

11.     At all relevant times ACF managed the vessel known as **M/V CARIBBEAN FANTASY**.

12.     At all relevant times ACF operated the vessel known as **M/V CARIBBEAN FANTASY**.

13.     At all relevant times ACF lease the vessel known as **M/V CARIBBEAN FANTASY**.

14.     At all relevant times BAJA FERRIES owned the vessel known as **M/V CARIBBEAN FANTASY**.

15.     At all relevant times BAJA FERRIES provides maintenance to the vessel known as **M/V CARIBBEAN FANTASY**.

4

**b. The incidents regarding Shadi Tarek Abumoala.**

16.    On August 15, 2016, **Shadi Tarek Abumoala** bought the tickets paying the total amount of $89.50.

17.    The voyage was scheduled to leave on August 16, 2016 at 7pm.

18.    The Ferry carried approximately 512 passengers/crewmembers.

19.    On August 16, 2016, Shadi Tarek Abumoala checked in to the Ferry.

20.    On August 17, 2016, around 7:30am, Plaintiff Shadi Tarek Abumoala woke up and headed to the Ferry's deck, but the Ferry's crewmembers denied Plaintiff to go on to the deck, since they told him there were problems with one of the engines and there was a lot of heavy smoke.

21.    Plaintiff then headed towards another path, but the Ferry's crewmembers denied Plaintiff to go on.

22.    At the time, Plaintiff and the rest of the passengers were instructed by radio to proceed quickly to the Ferry's deck and not to carry anything since they said it was only for a moment.

23.    People started running and when the passengers were all gathered in the Ferry's deck, the heavy smoke increased and the Captain started screaming in English and distributing Life Jackets to the passengers.

24.    At that time, it became a chaotic scene, since people were hysterical, screaming, pushing each other, shouting and the Ferry's crewmembers had the passengers cornered without letting them move freely.

5

25.     After a while had passed, Ferry's crewmembers started boarding the first life boat with children and elders. Shadi Tarek Abumoala witnessed how crewmembers took children from their mothers.

26.     The Ferry's crewmembers wanted to lower the life boat almost empty because they feared the cables would brake but the passengers started arguing and they filled the boat.

27.     After filling the first life boat, the Ferry's crewmembers directed Shadi Tarek Abumoala and passengers towards the back part of the Ferry, going through the inside part of the Ferry, which was completely full of heavy smoke.

28.     Shadi Tarek Abumoala, together with the rest of the passengers, inhaled the smoke generated from the fire and had to go through a very hot place, so they could jump into the slides.

29.      Plaintiff Shadi Tarek Abumoala was the third or fifth person to throw himself into the slides.

30.     The slide was not properly installed, was moving a lot and was very unstable.

31.     Then, the Ferry's crewmembers had Plaintiff jump to an unstable platform and then to an "inflatable life house", where a lot of people were vomiting and losing consciousness.

32.     Since all of them were sat together, the vomit run through the floor.

33.     Plaintiff Shadi Tarek Abumoala had to help several elderly people to get out, before getting out himself.

34.    Approximately at 11:30, Plaintiff along with the other passengers were taken to a United States Coast Guard boat, where they were filling the boat with passengers and moving them to another boat.

35.    At that time, three or four passengers had fainted and the Plaintiff, along with a friend had to stay in the first boat since there was no space left in the second boat.

36.    Plaintiff had to wait a long time and even help filling the boat with more people so they could be taken to the dock approximately at 12:30.

37.    No medical attention was provided to Shadi Tarek Abumoala.

38.    At that moment, Shadi Tarek Abumoala felt dizziness since he had inhaled a lot of heavy smoke and had pain in his left knee.

39.    When Shadi Tarek Abumoala woke up the next day, he had pain in all of his body due to the process of evacuation of the Ferry.

40.    Plaintiff's body pain was present for several days.

41.    On August 18th, 2016, Shadi Tarek Abumoala went to the Emergency Room of the municipal hospital of Sabana Grande, Policlínica Bernice Guerra.

42.    Plaintiff was ordered a CBC, BMP and was prescribed with Toradol 4 milligrams and Decadron 30 milligrams.

43.    Since the day of the incident, Plaintiff has not been able to sleep well, he wakes up several times during the night with a lot of sweating, he cannot concentrate well, cannot eat as he used to and he suffers from episodes where he remembers what happened in the incident.

44.     Plaintiff's primary physician, referred Shadi Tarek Abumoala to psychologist Cynthia Morales, who attended him on September 12, 2016 and recommended him individual treatment for acute post-traumatic stress disorder as a result of the incident.

45.     Such injuries occurred as a proximate result of the unsafe, negligent and unseaworthy condition of the vessel operated by Defendants.

**c. Incidents regarding the Severino Family.**

46.     On August 15, 2016, Caroline Evelis Severino Rivas and Policarpio Severino Caraballo, bought roundtrip ticket to travel from Santo Domingo, Dominican Republic to San Juan, PR, departing on August 16, 2016, on the Ferry. They were supposed to return on August 29, 2016.

47.     Caroline Evelis Severino Rivas and Policarpio Severino Caraballo, paid the total amount of $165.48 for each ticket totaling $330.96 for the two tickets.

48.     On August 16, 2016, Caroline Evelis Severino Rivas and Policarpio Severino Caraballo, boarded the Ferry at approximately 5pm and between 7pm-8pm the Ferry departed.

49.     The Ferry carried approximately 512 passengers/crewmembers.

50.     Caroline Evelis Severino Rivas and Policarpio Severino Caraballo, boarded the Ferry each one of them with a luggage.

51.     Although Caroline Evelis Severino Rivas and Policarpio Severino Caraballo, were happy to travel to PR, their happiness was destroyed when they started noticing the Ferry's defects.

8

52.     The air conditioning was not working well.

53.     Before departing, at approximately 6:45pm, Caroline Evelis Severino Rivas and Policarpio Severino Caraballo, felt defects when the engines started and were instructed to go down. The members in charge of the rope, threw the rope again.

54.     On August 17, 2016, around 7am, Caroline Evelis Severino Rivas and Policarpio Severino Caraballo, woke up and went to have breakfast. They were trying to get a view of "El Morro" but could not see it because they noticed heavy smoke and that the Ferry started burning.

55.     Caroline Evelis Severino Rivas and Policarpio Severino Caraballo, saw a crew member wearing a white overall who started running when he noticed the heavy smoke.

56.     Caroline Evelis Severino Rivas and Policarpio Severino Caraballo, could not eat breakfast since they were instructed to go to floor seven.

57.     Due to the fire, the Ferry's crewmembers instructed passengers to evacuate the Ferry.

58.     While at floor seven, they saw a chaotic scene, since people were hysterical, screaming, pushing each other and shouting.

59.     The distribution of the life jackets was a complete disaster, since the Caroline Evelis Severino Rivas and Policarpio Severino Caraballo, did not receive instructions for putting on the life jackets and later on, they noticed they were handed children life jackets.

60.    Caroline Evelis Severino Rivas and Policarpio Severino Caraballo, were ordered to board the life raft, but crew members stated that the first ones that will board the life rafts had to be minors, mothers and elders.

61.    At the time, there were only two small life rafts. Caroline Evelis Severino Rivas and Policarpio Severino Caraballo, could not board the life rafts since they were not considered as minors, mothers or elders.

62.    While waiting at deck 7, Caroline Evelis Severino Rivas and Policarpio Severino Caraballo, started inhaling smoke generating from the fire onboard the Ferry.

63.    A crew member said there was a slide in floor four and that they had to run over there so they could get in.

64.    Caroline Evelis Severino Rivas and Policarpio Severino Caraballo, started running panicked to floor four and Severino Rivas fell down to the floor, injuring the small finger on her left foot.

65.    While running to floor four, Caroline Evelis Severino Rivas and Policarpio Severino Caraballo, started inhaling smoke generating from the fire onboard the Ferry.

66.    Once Caroline Evelis Severino Rivas and Policarpio Severino Caraballo, arrived to floor four, they were instructed to take their shoes off and every piece of clothing that could get stuck.

67.    Caroline Evelis Severino Rivas and Policarpio Severino Caraballo, had to wait approximately one hour and a half so they could get to the slide.

68.    While waiting in line, a crew member told them that they were wearing children life jackets.

69.    As soon as they noticed that they were wearing children life jackets, they asked the crewmembers for two adult life jackets but Caroline Evelis Severino Rivas and Policarpio Severino Caraballo, were told that there were no adult life jackets available anymore. Caroline Evelis Severino Rivas and Policarpio Severino Caraballo, were extremely worried and scared for this, because they thought the children life jackets would not work for them.

70.    After waiting approximately one hour and a half, finally Caroline Evelis Severino Rivas and Policarpio Severino Caraballo, were ordered to threw themselves quickly into the slides. While sliding, Plaintiff Severino Rivas's body twisted and made a turn, falling to the floor with her body lying upside down. Plaintiff Severino Caraballo also threw himself through the slide.

71.    Then the Ferry's crewmembers moved Caroline Evelis Severino Rivas and Policarpio Severino Caraballo, to a black "inflatable life house" which it was Plaintiffs worst nightmare, since the ocean was rocky, the waves were getting in the open platform and there was a lot of movement in the inflatable life house. Furthermore, at the time, Caroline Evelis Severino Rivas and Policarpio Severino Caraballo, still had not eaten anything, they were feeling extremely dizzy and dehydrated.

72.    When Plaintiffs arrived to the black "inflatable life house" there was not any water left for them to drink, since the crewmember in charge of the

"inflatable life house" who was wearing a blue overall drank all of the water pouches available and even used them to wash his head.

73.    The "inflatable life house" was not prepared for this emergency.

74.    Plaintiff Severino Rivas felt extremely unsafe since the "inflatable life house" felt very light as she was sitting on a net. Plaintiff Severino Rivas had a feeling that it would break and that they could fall to the ocean anytime.

75.    Caroline Evelis Severino Rivas and Policarpio Severino Caraballo, were ordered to jump to a vessel with police officers. While jumping to this vessel, Plaintiff Severino Rivas injured her left foot from her ankle down, since the ocean was very rocky and there was a lot of movement due to the waves.

76.    At this point, Caroline Evelis Severino Rivas and Policarpio Severino Caraballo, had to wait for approximately two and a half hours, under the extreme heat of the sun, without having anything to eat, drink and while inhaling the heavy smoke.

77.    Caroline Evelis Severino Rivas and Policarpio Severino Caraballo, had to wait even more than the rest of the vessels, since the vessel that was transporting them went to rescue other boats that got stuck while transporting children.

78.    Plaintiff Severino Caraballo put his daughter Plaintiff Severino Rivas under him so she would not inhale the smoke.

79.    As a result, Plaintiff Severino Caraballo inhale all the heavy smoke and fainted.

80.    Plaintiff Severino Caraballo had to be aided by the police since there was white foam coming out of his mouth, he was not responding and was also unconscious.

81.    The police had to call an ambulance, which took approximately ten minutes to arrive. Plaintiff Severino Caraballo was then transported by the police in another vessel to a hospital.

82.    Plaintiff Severino Rivas wanted to go with her father but was instructed to stay and that she could not go with her father, even though he was in a state of unconsciousness.

83.    Caroline Evelis Severino Rivas and Policarpio Severino Caraballo, were separated and each one of them left in different vessels without knowing where they were going.

84.    Plaintiff Severino Rivas, not knowing the health condition of her father, was feeling extremely worried, anxious and nervous, since she thought that her father, Plaintiff Severino Caraballo, could have been dead or could have had a cardiac arrest.

85.    Plaintiff Severino Rivas had both her passport and her father's Plaintiff Severino Caraballo passport, they had no money with them and they had no way of communicating with each other.

86.    Once Plaintiff Severino Rivas arrived to the dock, she inquired ACF about her father's condition but no one knew anything about Plaintiff Severino Caraballo, where he was, nor his condition.

13

87.   Plaintiff Severino Rivas went to a group of people that were assisting near the Immigration station to inquire about her father Plaintiff Severino Caraballo, but they did not give her any information because they were only giving information concerning the children.

88.   At 3pm, Plaintiff Severino Rivas inquired again about her father Plaintiff Severino Caraballo, but no one knew anything about where he was or his condition.

89.   A friend of Plaintiff Severino Rivas mother Delsy Maria Rivas Amezquita, had to pick her up at the dock, since she had no money, no place or family to go to, nor way of communicating with her father.

90.   Plaintiff Severino Rivas finally realized that her father, Plaintiff Severino Caraballo, had been taken to the Emergency Room in Centro Medico of Puerto Rico, where he received medical treatment.

91.   Plaintiff Severino Caraballo attended to his cardiologist physician to receive medical treatment since the incident caused him extreme and uncontrolled high blood pressure.

92.   On August 24th, 2016, Plaintiff Severino Caraballo experienced vomiting, nausea and dizziness and had to be taken to the Emergency Room to receive medical treatment. Plaintiff Severino Caraballo was ordered treatment and was prescribed Merislon and Hypersil for one week.

93.   On September 20th, 2016, Plaintiff Severino Caraballo had to go back again to the Emergency Room since he was experiencing pain in all of his

14

body. Plaintiff Severino Caraballo was ordered treatment and was prescribed prescribed Combiplex for ten days.

94.    On September 30th, 2016, Plaintiff Severino Caraballo had to go once again to the Emergency Room due to chest pain and tachycardia. Plaintiff Severino Caraballo was referred to Internal Medicine and/or Cardiology.

95.    On October 5th, 2016 Plaintiff Severino Caraballo went to see Cardiologist Dr. Josue Pichardo, who found Plaintiff Severino Caraballo's pressure extremely high. Plaintiff Severino Caraballo was ordered treatment and was prescribed Minart (16mg) until present.

96.    Plaintiff Severino Caraballo was ordered multiple tests to monitor his blood pressure such as Echocardiography, Chest CT Scan, Blood Count, Glycemia, Licolized Hemoglobin, Urea, Creatinine, Total Cholesterol, Cholesterol HDL, Cholesterol LDL and Triglycerides tests.

97.    Plaintiff Severino Rivas attended orthopedic traumatologist Luis Berges Mejia, to receive medical treatment due to the extreme pain on her left shoulder, ankle, foot and finger.

98.    Plaintiff Severino Rivas was ordered an articular sonography of her left shoulder, was diagnosed with TCLBICEPS Tendinitis of the Proximal Third, Rotator Cuff Tenditinis and Subdeltoid Bursitis.

99.    Plaintiff Severino Rivas was referred to physiotherapy for the rehabilitation of her left shoulder, was ordered treatment for ten days and was prescribed the following treatment: Voldyme (200mg).

15

100.   Plaintiff Severino Rivas also had to attend psychiatrist Rossanna Ramírez, to receive medical treatment since as a result of the incident, she has not been able to sleep, all she thinks about is the boat and the water, whenever she closes her eyes, she sees water, whenever she was walking, she was always thoughtful and worried and had problems studying in the university.

101.   Plaintiff Severino Rivas was ordered treatment for six months with follow up visits and was prescribed the following treatment Sertraline (50mg) and Clorazepam (0.5mg).

102.   As a result of this incident, Plaintiff Severino Rivas has a terrible phobia to water, she hardly can shower and she cannot go up more than three floors.

103.   As a result of this incident, Caroline Evelis Severino Rivas and Policarpio Severino Caraballo, assured that they will never travel again on a ferry/cruise.

104.   Such injuries occurred as a proximate result of the unsafe, negligent and unseaworthy condition of the vessel operated by Defendants.

### FIRST CAUSE OF ACTION – NEGLIGENCE

105.   The allegations contained all in previous paragraphs are re-alleged as if fully alleged herein.

106.   The Ferry was built in 1989 in Japan, and is Baja Ferries property.

107.   The Ferry's flag is from Panamá.

108.   The Ferry do commercial activities between Dominican Republic and Puerto Rico such as ferrying passengers.

16

109.   Between 2011 and 2015, the US Coast Guard found at least 107 security deficiencies, which most of the them (approximately 44) were related to the fire system.

110.   Some of those deficiencies were related to the incorrect operating of the fire screen doors, which usually were not able to be close and/or were reported as open when they were close.

111.   On an October 16, 2014, Inspection made by the USCG stated that the "inflatable liferafts used in conjunction with MES shall comply with the requirements of Section 4-2. The liferafts 4, 13,17,18 &24 were found with the painter lines falling off the liferaft line storage pockets".

112.   A January 2015 inspection made by the United States Coast Guard ("herein "USCG") stated that oil fuel lines should be screened or protected in some way to avoid any pray or leakage onto ignition sources.

113.   Specifically in April 17, 2015, the USCG stated that the "fire screen doors shall be capable of closing at an angle of inclination of up to 3.5 degrees. The following double leaf doors were found out of sequencing and prevents the doors from closing" and that "all waste receptables shall be constructed of non combustible materials. Waste receptacles located on upper deck (open) were found to be plastic".

114.   During the past 36 months, USCG's inspections of the Ferries had led to detentions.

115.   In October, 2015, the Ferry was detained in San Juan for three days by the U.S. Coast Guard for three deficiencies related: fire safety measures

17

(international shore connection); crew certificates (certificates of competency) and ship's certificates and documents (safety manning document).

116. Other warnings provided by the US Coast Guard were that the fire extinguishers were not working well.

117. The US Coast Guard found deficiencies on the ceiling sprinklers that stop the flames.

118. Between March and July 2016, the Ferry underwent maintenance work at Europe.

119. Even though defendants informed the public that they would start operating on July 1, 2016, they were unable to provide ferrying service to passengers since the Ferry was on another country receiving maintenance.

120. In July 2016, while refueling the Ferry at Port of Gibraltar, prior to continuing across the Atlantic to Puerto Rico, the Ferry was detained for six days and related to deficiencies related to the auxiliary engines.

121. After the alleged repairs at the Port of Gibraltar, the Ferry continued its voyage to Puerto Rico.

122. While in their voyage, the Ferry's engines failed.

123. The ferry was unable to continue their voyage for approximately a day.

124. Due to said mechanical failure, the Ferry changed its voyage and travel to Santo Domingo, Dominican Republic.

125. At the Santo Domingo's Port, the Ferry allegedly repaired the engine.

126.   Early August, 2016, the Ferry arrived at the Port of San Juan, Puerto Rico.

127.   During the USCG inspection, they determined that one of three lifeboats were working.

128.   A USCG inspection early August 2016, found four deficiencies related to fire safety measures and one related to the propulsion and auxiliary machinery.

129.   During August 17, 2016's emergency, the Ferry's lifeboats and sliding were not working properly and/or were not properly installed.

130.   Two of the three lifeboats were not working well.

131.   One life boat got stuck while descending.

132.   The second lifeboat, got stuck while descending to the ocean and when it reached the ocean its engines failed.

133.   This second lifeboat, was rescued by other vessel and/or vessels.

134.   During the voyage from Santo Domingo to San Juan, and while Plaintiff was onboard the Ferry, the air conditioner was not working well and/or was not working at all.

135.   Such was an indication of mechanical and/or electrical failure.

136.   Due to information and/or belief the Fire started at approximately 7.15 am at the machinery room.

137.   The Fire at the Ferry started when the Ferry was near the Thermoelectric in Levittown, PR.

138. Defendants lack of repair and/or failure to provide proper maintenance to the Ferry and/or failure to properly and immediately repair the deficiencies informed by the USCG on their report dated August 17, 2016, among others, provoked the fire inside the Ferry.

139. Plaintiffs damages were a direct consequence of defendants' negligence by:  (i) failing to provide a safe ferry; (ii) failing to protect the passengers; (iii) failing to maintain safe premises; (iv) failing to provide adequate emergency instructions; (iv) by failing to hire adequate personnel which were not well trained and/or had lack of knowledge on emergency proceedings and/or had lack of knowledge on descending lifeboats; (v) by failing to repair and/or properly repair the engine, electric and/or propulsion defects; (vi) Defendants knew or should have known of the Ferry's mechanical, electrical and/or propulsion defects and did not repair it and/or failed to properly repair them; (vii)  Defendants' breached their duty of care to Plaintiff to the extent they failed to properly maintain properly working the lifeboats and other safety equipment; (viii)  defendant provoked Plaintiff unnecessary delay in the evacuation of the Ferry; (ix) failed to cancel the voyage despite knowing that the vessel was not properly working; (x) the Ferry was operated knowing was unseaworthy due to the defective engines, lifeboats, electricity, air conditioners, emergency equipment and procedures; (xi) the pulley system of one of the life boats was not working well and/or was not working at all and/or was not properly repaired causing that a life boat could not properly descend.

140.   Due to the abovementioned, defendants failed to comply with the general maritime and admiralty law of the United States and with the Art. 1802 and 1803 of the PR Civil Code.

141.   Defendants actions and omissions, through fault and/or negligence, caused damages to Plaintiffs, in violation of Art. 1802 and 1803 of the PR Civil Code and General Maritime Law entitling plaintiff to damages caused as a result of those acts and omissions.

142.   Defendants are jointly liable against Plaintiffs.

143.   Defendants' negligence and/or intentional acts were a proximate legal cause of Plaintiff's injury.

144.   On the other hand, as previously stated on August 15, 2016, Plaintiff Shadi Tarek Abumoala bought the ticket paying the total amount of $89.50.

145.   In view that Plaintiff was unable to enjoy the Ferry and the Ferry was unable to reach the Port that was hired, then Defendants shall reimburse Plaintiff the total amount of $89.50.

**SECOND CAUSE OF ACTION – UNSEAWORTHINESS**

146.   The allegations contained all in previous paragraphs are realleged as if fully alleged herein.

147.   Defendants maintained an unsafe place for plaintiff and exposed them to danger while ferrying passengers with a Ferry with serious engine, electricity and propulsion defects and also with the lifeboats, mechanical and technical defects, and with lack of maintenance to the Ferry, as abovementioned.

21

148.  The vessel was unseaworthy and defendants' failed to repair the dangerous situation.

149.  Plaintiffs injuries occurred as a proximate result of the unsafe and unseaworthy condition of the vessel, which was managed, operated and/or maintained by defendants. In addition, said injuries were caused in whole, as a proximate result of negligence on the part of the Defendants, its agents, servants and/or employees.

**THIRD CAUSE OF ACTION – CLAIM AGAINST THE P&I CLUB.**

150.  The foregoing paragraphs are realleged and reasserted herein.

151.  Co-defendants **STEAMSHIP      MUTUAL      UNDERWRITING ASSOCIATION LIMITED;** is liable for the negligence, fault, legal violations and unseaworthy conditions of their insured up to the coverage limit of the certificate of entry to their benefit. Plaintiff hereby exercises their right to present a direct action against the aforementioned protection and indemnity club.

**DAMAGES**

152.  As a result thereof, Plaintiff Shadi Tarek Abumoala suffered and continue suffering: acute post-traumatic stress disorder, knee pain, muscle pain, pain in all body, dizziness, dehydration, insomnia and other sleep disturbances such as he wakes up several times during the night with a lot of sweating, he has not been able to sleep well, he cannot concentrate well, cannot eat as he used to and he suffers from episodes where he remembers what happened in the incident, among others, all of which affects his daily activities, including his family life.

153.   As a result thereof, Plaintiff Severino Rivas suffered and continue suffering: pain in her left shoulder, TCL BICEPS Tendinitis of the Proximal Third, Rotator Cuff Tenditinis and Subdeltoid Bursitis, heartburn, pain in her left ankle, foot and small finger, was referred to physiotherapy for the rehabilitation of her left shoulder, was ordered treatment for ten days, prescribed with Voldyme (200mg), phobia to water, unable to get close to the ocean, unable to go up more than three steps, dizziness, nausea, nervousness, psychiatric and psychological damages, extreme panic, sadness, anxiety during the ordeal, vomit, a sense of despair and helplessness, dehydration, a lack of interest in daily activities, trouble studying, insomnia and other sleep disturbances such as nightmares, her tranquility has been seriously affected, among others, all of which affects her daily activities, was ordered treatment for six months with follow up visits and was prescribed the following treatment Sertraline (50mg) and Clorazepam (0.5mg).

154.   As a result thereof, Plaintiff Severino Caraballo suffered and continue suffering: fainting, unable to get close to the ocean, dizziness, nausea, psychiatric and psychological damages, extreme panic, sadness, anxiety during the ordeal, a sense of despair and helplessness, dehydration, a lack of interest in daily activities, insomnia and other sleep disturbances such as nightmares, his tranquility has been seriously affected, among others, all of which affects his daily activities.

155.   Plaintiffs damages herein alleged apply to all causes of actions.

23

156. As a result of the events described herein, Plaintiffs has suffered and continues to suffer irreparable physical, economical and emotional damages.

**VI. RELIEF**

157. Wherefore, plaintiffs prays that this court enter judgment in favor of plaintiff and against defendants and award the plaintiffs the following monetary amounts, totaling $5,100,000.00 to be paid by defendants:

    a. For Plaintiff Shadi Tarek Abumoala's emotional damages and pain and suffering, and physical damages, an amount in excess of $1,500,000.00.

    b. for Plaintiff Severino Rivas emotional and physical damages and her pain and suffering an amount in excess of $1,500,000.00.

    c. for Plaintiff Severino Caraballo emotional and physical damages and his pain and suffering an amount in excess of $1,500,000.00.

    d. Punitive damages for an amount not less than $200,000.00 to each of the Plaintiffs.

d. Provide for the payment of all applicable interests, including prejudgment interest, together with reasonable attorney's fees, litigation expenses and the costs of this action.

e. Grant plaintiffs such other and further relief as the Court may deem appropriate and proper and retain jurisdiction over this action in order to assure full compliance with any decree issued by this court.

24

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this January 16, 2017.

**BELLVER ESPINOSA LAW FIRM**
Condominio El Centro I, Suite 801
500 Muñoz Rivera Avenue
San Juan, Puerto Rico 00918
Tel(787) 946-5268/Fax(787)946-0062

S/Alejandro Bellver Espinosa
Alejandro Bellver Espinosa, Esq.
U.S.D.C. – P.R. 225708
Email: alejandro@bellverlaw.com


/s/ Cristina Méndez-Buch
Cristina Méndez-Buch, Esq.
U.S.D.C. – PR 231705
Email: cristina@bellverlaw.com